Commonwealth *v.* Lemons, Appellant.

Argued April 18, 1961. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Irvin Siegel,* for appellant.

*Arlen Specter,* Assistant District Attorney, with him *Charles Durham,* Assistant District Attorney, *Paul M. Chalfin,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 27, 1961:

The appellant, Fletcher Lemons, was convicted of voluntary manslaughter in the Court of Quarter Sessions of Philadelphia County before a court sitting without a jury. At the termination of the presentation of the Commonwealth's evidence, the defendant entered a demurrer but the court ruled that it would dispose of it at the end of the trial. Eventually dismissing the demurrer, the court found the defendant guilty, as indicated, and sentenced him to a term of imprisonment of not less than 2½ years nor more than five years. The defendant appealed.

The record does not sustain the verdict. On the evening of October 17, 1959, the defendant Fletcher Lemons was attending to his duties as bartender in the

Village Bar located at 12th and Reno Streets in Philadelphia when, at about 8 o'clock, a William Patterson entered the bar and demanded that the defendant Fletcher Lemons pay him $8 which he owed him. Lemons replied that he did not have the money but that he was being paid at midnight. Reviling the defendant, Patterson left but returned an hour or so later brandishing a revolver and renewing his demands for his $8, accompanying his exhortations with threats of "I will kill you."

In a few minutes Patterson pocketed his revolver whereupon Lemons obtained a revolver of his own which he kept close to the cash register. Armed with this weapon, he ordered Patterson to give up his revolver. Patterson seemed to comply with Lemons' request and proceeded to place his revolver on the bar, but, suddenly, he seized Lemons, who was still holding his revolver, by both wrists and a struggle followed. In that struggle, Lemons' revolver was discharged and the bullet struck an innocent bystander, Thomas Howze, passing through his shoulder and finally finding lodgement in the heart of another innocent bystander, Thomas Wearing.

The Commonwealth called four witnesses who testified to what occurred in the Village Bar on the fatal night. With some insignificant discrepancies in testimony they fundamentally all related the same story that the defendant not only did not intentionally fire the weapon which killed Wearing, but that he was in no way the instigator of the altercation which resulted in the shooting.

Thomas Howze, the man who was shot in the shoulder, testified: "Q. What next happened? A. At the time I walked over to the bar I asked Fletcher what was the argument about. Patterson reached up and grabbed Fletcher and they were both struggling—Q. Struggling for what? A. He reached to grab Fletcher

by both wrists and during the struggling, *by accident* the shot goes off." (The defendant Lemons was frequently referred to in the trial by his first name of Fletcher). (Emphasis supplied).

Howze's entire testimony depicts Patterson as the aggressor: "Q. When you turned around to walk towards him what was going on between Patterson and Fletcher, if anything? A. They were. arguing. A. The argument was still going on? A. Yes. Q. At any time did you see Patterson with a weapon? A. No, I did not. Q. Did you have full observation of the two men? A. Yes. Q. If you had full observation between the two men, what did you observe? A. Nothing but the argument between the two men. I walked over to Fletcher —he is to my right; as I walks over that way—Q. I believe you said in answer to a question that you saw Patterson grab Fletcher. A. That's right. Q. Will you go over that and tell us exactly what happened? Give us the exact sequence and describe it as best you can. How far were you away from Patterson when you observed this? A. The argument? Q. When he grabbed him. A. He was here and I was standing right next to him. He was sitting on the stool. Q. To his left or to his right? A. He was to my right. Q. You were close enough to observe everything that was going on? A. Yes. Q. Go ahead. A. As soon as I asked Fletcher what was the argument about, Patterson reached up and grabbed Fletcher. Q. At that point did anyone have any weapon? A. I don't know who had weapons, to tell you the truth. It was just so fast that the shot was fired— Q. What part of Fletcher's body was grabbed? A. His two wrists. Q. I assume Patterson's two hands grabbed them. A. Yes. Q. How long was he holding onto those wrists? A. It was just a short struggle. Q. How long after he grabbed Fletcher in this manner was it that you heard the weapon go off? A. About thirty seconds, I imagine—it was fast. Q. The

weapon went off after Patterson had grabbed his two
wrists? A. That's right. Q. Can you describe how high
up in the air Patterson had Fletcher's wrists? A. Just
about above the bar. Q. In terms of distance, how far
above the bar would you say it was? A. About a foot,
I guess."

The Commonwealth witness Lewis Smith testified
that he saw Patterson pointing his revolver at Lemons
as Patterson exclaimed: "I will kill you." Although
Smith did not see the actual shooting he said: "When I
heard the shot, Patterson at that time had his hand on
Fletcher." He said that immediately after the shot was
fired he "saw Lemons standings there and this fellow
Patterson. He had his hands on Lemons' sleeves."

In sustaining its verdict the court below said: "It
is basic that the Trial Judge like the jury is not bound
to accept the version of either the Commonwealth or
that of the defense, but must determine from the evi-
dence what the true situation was at the time of the
homicide. Commonwealth v. Steele, 362 Pa. 427."

It is true that the fact-finding tribunal is not re-
quired to accept the version of either the Common-
wealth or the defendant, but it may not make up a ver-
sion of its own, as one writes a play. In its version
of what occurred the trial court said: "This Court is
convinced that defendant, Fletcher Lemons, became in-
flamed with wrath and intentionally pulled the trigger
of the weapon which he held to inflict grievous bodily
harm on the then disarmed Patterson."

This statement would be an appropriate dramatic
finish to the preliminaries of Patterson walking into
the bar with a revolver demanding money, and then
the bartender, indignant at this boldness, becoming "in-
flamed with wrath", whipping out his own revolver,
and shooting at the daring invader. The only difficulty
with the statement, however, is that what the trial
judge describes did not happen. No matter what imag-

ination may be brought to play in this barroom scene, there is nothing to add the melodramatic flourish of the bartender "intentionally pulling the trigger."

Nor may a fact-finder supply, on his own initiative, a missing ingredient to the case of the prosecution. During the trial, the judge, in refuting the argument of defendant's counsel that the weapon was discharged accidently, said: "It could not happen that way. You can't just act like that. You have really got to pull this thing. I would liked to have had someone here to testify to that. *I tried to* pull it." (Emphasis supplied.)

What the trial judge tried to do is not evidence. The fact that he couldn't pull the trigger does not prove anything. There is no evidence as to what experience, if any, he had with firearms, and certainly there was no evidence to demonstrate what pound pressure, if any, he had in the lower two phalanges of his trigger finger. After stating that he could not pull the trigger, the trial judge observed: "If he hit him over the head, he would have done enough."

This remark is too ambiguous to call for appellate analysis, but if by it the judge intended to suggest that Lemons should have hit Patterson over the head, it is enough to say that it is not up to the trial judge to suggest what should have happened, or could have happened. The province of a trial judge sitting without a jury is to do what a jury is required to do, namely, consider all the evidence; reconcile contradictions and discrepancies in the testimony, if possible; dismiss what is incredible; and, from all that is presented, assemble a logical, continuous account which rings with verisimilitude, appeals to reason and convinces the judgment that the controverted event occurred in that and in no other manner. The trial judge here obviously did not do this. From the paint box of surmise, conjecture, and imagery he obtained pigments with which he pro-

duced a picture which finds no confirmation in the record.

The person who was really responsible for the tragic death in this case was Patterson. In a separate trial of his own, he was found guilty of involuntary manslaughter. It is significant that the Commonwealth did not call Patterson as a witness. Nor did the trial judge seem to find any fault in Patterson who, according to all the witnesses, Commonwealth's and defendant's, was the trouble maker and cause of the untimely death of Thomas Wearing.

The trial court should have granted the demurrer.

The judgment and sentence of the Court below is reversed and the defendant discharged.